UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| BRIAN FLYNN,<br><br>        Plaintiff,<br><br>  v.<br><br>GUNDERSON RAIL SERVICE LLC, an Oregon limited liability company, d/b/a GREENBRIER RAIL SERVICES,<br><br>        Defendant. | CASE NO. 18-5064 RJB<br><br>ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

  This matter comes before the Court on Defendant Gunderson Rail Service, LLC, d/b/a Greenbrier Rail Services' ("Greenbrier") Motion for Summary Judgment. Dkt. 11. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

  This case arises from an accident at Defendant Greenbrier's railcar servicing facility when a train axel fell on the Plaintiff's foot, crushing it. Dkt. 1. Greenbrier moves for summary judgment dismissal of the case, arguing that Plaintiff's claims are barred by Washington's Industrial Insurance Act ("IIA"), RCW § 51.04.010, because Greenbrier and the Plaintiff had an

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 1

employment relationship. Dkt. 11. Plaintiff opposes the motion and argues that he was an employee of LaborWorks, Industrial Staffing Specialists ("LaborWorks"), a temporary employment agency, and not an employee of Greenbrier. Dkt. 16. For the reasons provided below, the motion for summary judgment dismissal (Dkt. 11) should be denied.

## I. RELEVANT FACTS AND PROCEDURAL HISTORY

In around 2010 or 2011, after having difficulty finding permanent full-time employment, Plaintiff applied to LaborWorks. Dkt. 13-1, at 4. The Plaintiff felt that LaborWorks primarily hired for "day employment," as opposed to "temporary employment," and would pay people by the day instead of biweekly. *Id.*, at 15.

As is relevant here, on November 24, 2014, LaborWorks contacted the Plaintiff and told him they had an assignment for him. Dkt. 13-1, at 4. The Plaintiff went to LaborWorks; two men there told him that he had been assigned to Greenbrier for a "temp to hire," which Plaintiff understood to mean that he had a chance, after a period of time, to be hired for a full-time permanent job. *Id.*, at 4 at 15-16. The Plaintiff asserts that LaborWorks gave him a one page contract (that they used to pay him), they kept a copy, and sent a copy to Greenbrier for its records. Dkt. 13-1, at 13-14. He does not remember what the contract said and did not keep a copy. *Id.*

According to Don Lambert, the Plaintiff's supervisor at Greenbrier, LaborWorks gave the Plaintiff a work order which was also sent to Greenbrier. Dkt. 14, at 2. The work order had spaces to fill out and included how many hours the Plaintiff was supposed to work, required Greenbrier to state whether or not the Plaintiff's work was satisfactory, and "gave Greenbrier the final word on the release of payment to the Plaintiff." Dkt. 14, at 2.

Greenbrier contracts with LaborWorks for the provision of "temp-to-hire" workers, through a General Staffing Agreement ("Staffing Agreement"). Dkt. 14, at 1. Under this Staffing Agreement, LaborWorks locates and screens workers, and assigns them to client worksites. Dkt. 12, at 1 and 14-1, at 1. Greenbrier agrees to "properly supervise assigned employees performing its work," "provide appropriate information, training and safety equipment" to the assigned employees, and pay for the assigned employee's wages, payroll taxes, and workers' compensation insurance premiums. *Id.* LaborWorks "keeps a commission and passes through the rest of Greenbrier's payment to the worker and appropriate government entities." Dkt. 12, at 1.

Plaintiff drove to Greenbrier, arriving around 7:00 a.m. Dkt. 13-1, at 17. Plaintiff states that he met with Steve Jackson who told him not to do drugs, and told him about his duties, which included: cleaning and fixing rail car axels and entering data into the computer system. *Id.*, at 20. He was also expected to move the rail axels "from one location to another with a pneumatic hook lift." Dkt. 14-1, at 2. Mr. Jackson also provided the Plaintiff with a training book so that he could get certified to do the work. Dkt. 13-1, at 20. Plaintiff states that other than that book, he was not given "any employee handbooks, any of [Greenbrier's] employee packets, [or] any of their employee safety rules." Dkt. 17, at 10. He felt that he was just a "contract worker . . . there to help [Greenbrier's] employees." *Id.* He maintains that Greenbrier did not train him, just told him what they wanted him to do. Dkt. 17, at 11. The Plaintiff states that the people at Greenbrier "didn't tell [him] how to work, they didn't tell [him] their rules, they didn't tell their . . . employee guidelines, but they instructed [him] on what they wanted [him] to do." Dkt. 17, at 11. He states that he did not make recommendations as to how to make the Greenbrier facility safer because he was "not their employee." Dkt. 17, at 12.

According to the Plaintiff, the management at Greenbrier held morning meetings to discuss the day's work, to go over the goals for the day, and to share information on items like benefits. Dkt. 13-1, at 25. The Plaintiff states that Mr. Jackson told him to "take his time," while doing the work because it was dangerous. *Id.*, at 27. The Plaintiff states that, at the same time, the supervisors "would hint" that "[t]hey would need [him] to move faster." *Id.*, at 32. LaborWorks did not give Plaintiff any instructions on how to do his job at Greenbrier. *Id.*, at 22.

The Plaintiff returned to LaborWorks the next morning to get paid and pick up his contract. Dkt. 13-1, at 22. They told him not to come every morning and that they would put him on a weekly schedule. *Id.*, at 23. He returned on Mondays to pick up his weekly contract and on Fridays to get paid. *Id.*, at 24. The Plaintiff felt that "he was contracted with LaborWorks because LaborWorks was paying [him.]" *Id.*, at 34. He understood that it was LaborWorks that made the decision as to whether he stopped working for Greenbrier. *Id.*, at 35-38.

On December 11, 2014, the Plaintiff suffered an injury while at work. Dkt. 13-1, at 24. An axle was being moved, it fell, and landed on Plaintiff's right foot. *Id.*, at 28. At the time of the injury, the Plaintiff stated, "Please don't tell [the supervisor] Don [Lambert]. I would like to keep my job." *Id.* The Plaintiff's foot went numb. *Id.* The other employees called Mr. Lambert, who informed the Plaintiff that the Plaintiff failed to center the axel, causing it to fall. *Id.*, at 29. According to the Plaintiff, Mr. Lambert then stated that they needed to call LaborWorks to do a urine analysis. *Id.* The Plaintiff maintains he told them that he was going to the hospital and left. *Id.* He had to have two toes amputated. Dkt. 18, at 1.

On December 8, 2017, the Plaintiff filed this case in Pierce County, Washington Superior Court. Dkt. 1-1. The Plaintiff asserts a negligence claim against Greenbrier and seeks damages

and costs. *Id.* Greenbrier removed the case, claiming this Court has jurisdiction based on the diversity of the parties' citizenship pursuant to 42 U.S.C. § 1332. Dkt. 1.

## II. DISCUSSION

Under the rule of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts sitting in diversity jurisdiction, as is the case here, apply state substantive law and federal procedural law. *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

### B. EMPLOYER'S IMMUNITY DEFENSE UNDER WASHINGTON'S INDUSTRIAL INSURANCE ACT

Section 51.04.010 of Washington's IIA, "removes most workplace injury claims from Washington's common law tort regime." *Carrera v. Olmstead*, 189 Wn.2d 297, 302 (2017)(*citing* RCW 51.04.010). It is "structured around a grand compromise between workers and employers: injured workers are guaranteed certain benefits regardless of fault, while employers are immunized from workplace negligence actions." *Id.*, at 302-303. "While it generally immunizes employers from liability for negligence, the Act extends no such protection to third parties. Instead, RCW 51.24.030 carves out an exception to the general abolition of civil suits by authorizing an injured employee or her beneficiary to sue potentially liable third parties." *Id.*, at 303-304 (*citing* RCW 51.24.030(1) ("If a third person, not in a worker's same employ, is or may become liable [for] ... a worker's injury ..., the injured worker or beneficiary may elect to seek damages from the third person.")).

The issue raised in this motion is whether Greenbrier was Plaintiff's "employer" under the IIA at the time of his injury, immunizing it from suit pursuant to 51.04.010.

For purposes of the IIA, an employment relationship exists only when: (1) the employer has the right to control the employee's "physical conduct in the performance of his duties, and (2) there is consent by the employee to this relationship." *Rideau v. Cort Furniture Rental*, 110 Wn. App. 301, 303–04 (2002)(*citing Novenson v. Spokane Culvert & Fabricating Co.*, 91 Wash.2d 550, 553 (1979)). "The burden of avoiding liability on the basis of the loaned servant doctrine is on the person claiming it, the party attempting to gain the benefits of statutory immunity from common law suit." *Id.* at 304.

The parties do not meaningfully dispute that Greenbrier had the right to control the Plaintiff's "physical conduct in the performance of his duties," and so Greenbrier meets the first prong of the test of whether there was an employment relationship.

Greenbrier must also show that the Plaintiff consented to the employment relationship such that "mutual agreement existed between them." *Rideau*, at 304. "[W]hile an employer may 'loan' an employee to another, the borrowing employer will not become an 'employer' for purposes of RCW Title 51 unless a mutual agreement exists between the loaned servant or 'borrowed employee' and the borrowing employer." *Rideau*, at 304. "With respect to consent, there must be clear evidence of a mutual agreement between the employee and employer such that the employee has clearly consented to be the 'employee' of the 'employer.'" *Rideau*, at 307. "An employee's subjective belief as to the existence of an employer-employee relationship is material to the issue of consent." *Rideau*, at 307.

The motion for summary judgment (Dkt. 11) should be denied. The Plaintiff has pointed to sufficient issues of fact that he did not consent to or believe that he had an employer-employee relationship with Greenbrier. The Plaintiff states that he never believed that he was an employee of Greenbrier and did not consent to be an employee of Greenbrier. Dkt. 18, at 2. He maintains

ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT - 7

that LaborWorks paid him and made his workers compensation payments. Dkt. 18, at 2. The Plaintiff states that he knew that his placement at Greenbrier could have led to a permanent position with Greenbrier, but that he was not offered one. Dkt. 18, at 2. While Plaintiff reported daily to Greenbrier, he did so at LaborWorks' direction. Dkt. 13-1, at 24. After his first day, LaborWorks told him they would put him on a weekly schedule to pick up his contract and to get paid. Dkt. 13-1, at 23. The Plaintiff felt that "he was contracted with LaborWorks because LaborWorks was paying [him.]" *Id.,* at 34. He understood that it was LaborWorks that made the decision as to whether he stopped working for Greenbrier. *Id.,* at 35-38. The Plaintiff states that other than a book on how to get certified, he was not given "any employee handbooks, any of [Greenbrier's] employee packets, [or] any of their employee safety rules." Dkt. 17, at 10. He felt that he was just a "contract worker . . . there to help [Greenbrier's] employees." The Plaintiff states that the people at Greenbrier "didn't tell [him] how to work, they didn't tell [him] their rules, they didn't tell their . . . employee guidelines, but they instructed [him] on what they wanted [him] to do." Dkt. 17, at 11. He states that he did not make recommendations as to how to make the Greenbrier facility safer because he was "not their employee." Dkt. 17, at 12.

While Greenbrier argues that there is evidence supporting Plaintiff's implied consent to an employment relationship – like Plaintiff's consent to Greenbrier's control over his activities, his schedule, pay and performance of his duties - under Washington law, an employee's subjective belief is material to the issue of consent. *Rideau*, at 307. This is because by accepting an employment relationship, an employee gives up traditional tort remedies in exchange for the protections afforded under the IIA. *Id.* Although Greenbrier emphasizes that there are facts supporting the notion that Plaintiff impliedly consented to an employment relationship, there are facts supporting the reverse. Greenbrier has failed to carry its burden on the second prong of the

test; an employment relationship between the Plaintiff and Greenbrier should not be imputed as a matter of law. The motion for summary judgment (Dkt. 11) should be denied.

### III. ORDER

Therefore, it is hereby **ORDERED** that:

- Defendant's Motion for Summary Judgment (Dkt. 11) **IS DENIED.**

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 31st day of October, 2018.

*Robert J. Bryan*

ROBERT J. BRYAN
United States District Judge